Conery, J.
dissents and assigns reasons.
11 This is a close case. In my view, close cases such as this should not be dismissed by Summary Judgment. A young lady died as a result of alleged failure to timely diagnose and treat a concussion she sustained in a vehicle/motorcycle collision. According to defendant, hospital’s statement of uncontested material facts, “As a result of the accident, Ms. Gannard was thrown a distance of approximately 75-100 feet, which caused severe orthopedic injuries.” She landed on pavement and was not wearing, a helmet at the time of the accident. It doesn’t take a medical or nursing expert to suspect that Ms. Gannard likely sustained head trauma and/or a concussion.
This case was pending in the trial court for over nine (9) years. When it first came up for hearing on hospital’s summary judgment motion, the trial court denied the motion. A few days later, the trial court issued a minute entry changing the ruling and granted hospital’s motion for summary judgment. No Reasons For Judgment were filed and no analysis of the evidence was undertaken to support the conclusion that there were no material facts in dispute. The majority finds no genuine “issue material facts exists” and affirmed the trial court’s ruling. This young lady’s family deserves to have this case decided by a jury. I respectfully ladissent for the reasons which follow.
First and foremost, I would find that there is a genuine issue of material fact as to whether the failure of the intensive care nurses to correctly report decedent’s headache complaints to her treating physicians led to a delay in treatment of a concussion which caused her intracranial pressure to build, eventually causing her death.
There is no question that Ms. Gannard sustained severe head trauma in the underlying automobile/motorcycle collision. In fact, in OLOL’s summary judgment motion, the hospital admitted that the following facts were undisputed:
1. "While riding as a guest passenger on a motorcycle,- Niki Lynn Gannard was involved in an accident on April 21, 2007 in which another car traveling in the opposite direction attempted a left turn directly into the path of the motorcycle.
2. As a result of the accident, Ms. Gan-nard was thrown a distance of approximately 75-100 feet, which *118 caused severe orthopedic injuries. Ms. Gannard was not wearing a helmet at the time of the accident.
3. Ms. Gannard was transferred via ambulance to OLOL immediately after the accident, and her treatment was assumed by Dr. Colomb.
Plaintiff l'etained two medical experts, Dr. Chaput and Dr. Breech, both of whom reviewed all of the hospital and medical records, all of which were introduced in evidence for summary judgment purposes. In addition, plaintiff filed lengthy affidavits from both of these two doctors, each of whom were well qualified and had extensive experience in emergency room and ICU protocol. In its brief before this court, plaintiffs counsel cited numerous pages of the hospital records demonstrating that Ms. Gannard complained of severe headaches to the staff in ICU. There is a material issue of fact as to whether the severity, duration and intensity of those headaches, noted in the record and cited by plaintiffs |scounsel in brief, were timely and properly relayed to Ms. Gannard’s treating physician, Dr. Colomb.
Dr. Chaput and Dr. Breech were later deposed by defendant hospital and their depositions were introduced both in support of and in opposition to the hospital’s motion for summary judgment. Both attorneys asked the doctors for opinions based on their interpretation of what they felt the evidence would establish at trial.
When considering the affidavits from Dr. Chaput and Dr. Breech, rendered after review of aJl the medical records without qualifying hypothets by two excellent attorneys, there clearly are expert medical opinions from both doctors that the hospital intensive care nurses breached the standard of care, which led to a loss chance of survival of the patient.
Ms. Gannard was fully conscious and able to communicate when she was brought to the emergency room at Lourdes. Likewise, she was fully conscious post—surgery while in intensive care for two days before she died. I would respectfully suggest that, at minimum, there are questions of material fact as to whether the hospital personnel in both the ER and Intensive Care Unit promptly and correctly ascertained sufficient history from Ms. Gannard as to the source of her headaches, and whether the intensive care nurses promptly and correctly reported the severity and intensity of Ms. Gannard’s headaches and deteriorating condition to her attending physician, Dr. Colomb. Dr. Co-lomb testified by deposition that they did not:
Q. Were you ever made aware of conversations between Ms. Gannard’s family, and in particular her mother, Ms. Flournoy, who was here earlier, and the nursing staff about persistent headaches that entire first day following the orthopedic surgeries?
|4MR. JUDICE: Again, on the 22n<1?
MR. STRENGE: The 22nd, yes.
A. No, sir.
[[Image here]]
MR. STRENGE: (CONTINUING)
Q. Let me be a little bit more specific and add to that general premise that I’ve just set forth is that it’s my impression based upon both the—some of the nursing entries as well as information provided to me by the family that Ms. Gannard had persistent headaches that entire day after coming out of the anesthesia from her orthopedic. She was also given medicine for nausea. I don’t know if you prescribed that or if somebody else would have done that. But knowing that or had you known that—let me put it that *119 way—would you have ordered any particular studies of any kind to further evaluate the cause of the headaches?
A. If some nurse would have called me to tell me that she was having severe, persistent headaches throughout the day, I would have ordered a CT scan of her head at that point, but I never got that, not one time. MR. JUDICE: Never got “that”?
A. I never got that information that she had severe, persistent headaches throughout the day. The only time I ever got a call about any headache was at 8:00 on April the 22nd, eight p.m. April the 22nd, saying that she had a mild headache.
I spoke with the nurse, and I said, “Well, how is she doing?” and she said, “She’s doing fíne.” She said that she had been visiting with her family throughout the day and was stable, awake and alert, she had no neurological findings and that her blood pressure and everything was stable. And that was the only thing I got, was that she had a mild headache. And, in fact, the nurse told me that she drank a lot of eoffee and thought that it might have been related to caffeine withdrawal.
[[Image here]]
Q. So to basically sum up, April 22nd you saw Ms. Gannard one time early in the morning; you had several calls from the nurses, as we’ve described—I’m not going to go through them | ¡^individually—but only one of those calls, you’re telling me, was there any mention of a headache to you by the nursing staff at Our Lady of Lourdes Hospital?
MR. JUDICE: Object to the form of the question. You can answer it.
A. Correct. There was only one call about a headache.
MR. STRENGE: (CONTINUING)
Q. And you said it was described as a mild one at that?
A. Correct.
One of the nurses on duty admitted that when she spoke with Dr. Colomb at 8:00 p.m. on April 22, she reported only that the patient and her family were concerned that the severe headaches related by Ms. Gannard to the nursing staff may have been due to caffeine withdrawal, and on that basis Dr. Colomb prescribed Esgic, as Ms. Gannard had told the nurses that she had taken that medication in the past.
Obviously, Ms. Gannard did communicate with the nurses and her family such that a proper history of severe head trauma from the collision could and should have been obtained. In fact, in many of the nurses’ notes, there are continuing references of headaches that were constant in duration and severe in intensity. Dr. Co-lomb stated clearly that he was not told that his patient suffered headaches that were “severe in intensity and constant in duration,” as reflected in many of the nurses’ ICU notes.
Dr. Chaput, a neurosurgeon with over forty years’ experience, testified by deposition that if a patient suffering from the severe trauma that Ms. Gannard had experienced, reported headaches for hours, constant in duration and severe in intensity, he would expect the intensive care nursing staff to have promptly | fireported those symptoms to the treating physician, Dr. Colomb. Brain scans could then have been ordered, the patient intubated and cranial pressure closely monitored, along with repeat CT scans and close monitoring of the patient. A partial craniotomy could have been performed to ease the pressure on the brain.
*120 Dr. Chaput noted that if a CT scan of the brain had been ordered early on, which Dr. Colomb said he would have done had the patient’s symptoms been accurately obtained, recorded, and reported to him, this young lady would have had a chance at survival.
In his initial sworn medical affidavit filed of record in opposition to the motion for summary judgment, before the attorneys started asking hypothets based on their interpretation of the evidence in depositions, Dr. Chaput stated that he studied all of Ms. Gannard’s medical records and noted in pertinent part:
The first documented complaints by the patient of headache occurred on April 22, 2007 at 1053 hours. Throughout that day,[1] the patient had persistent complaints of headache and required frequent medication. By April 23, 2007 at 10:00 a.m., the headaches were documented to be of such severity that the patient pointed to her forehead cursing and unable to give pain scale rating of the headache. She could only verbalize “give me something for my head.” Forty minutes later, a loud scream was heard coming from Ms. Gannard’s room. Upon investigation, Ms. Gannard had white, foamy secretions around her mouth and was unresponsive. It is my opinion that this ictus represented transtentorial herniation due to massively elevated intra-cranial pressure. This had been developing from progressive cerebral edema as a result of the diffuse axonal injury of the brain. Closed head injury causes this brain swelling to peak 2-4 days after the initial injury. Diffuse cerebral edema regardless of etiology is an extremely serious and often fatal condition. The treatment of diffuse cerebral edema falls into three mutually interdependent spheres; first, supportive care, secondly, determination of the exact intracranial pressure and monitoring of this pressure continuously, and thirdly, extensive craniotomy to remove a large portion of the surrounding bone allowing the brain to expand without producing excessive intra-cranial pressure.
17Failure to recognize the likelihood of diffuse axonal injury with this mechanism of trauma, that is, propulsion through the air for a distance of 75-100 feet with impact on pavement, precluded neurologic monitoring by means of sequential CT imaging of the brain and measurement/monitoring of intracranial pressure. Had this been accomplished, this extremely serious and indeed life-threatening condition could have been treated by surgical craniotomy. This procedure when performed before transtentorial herniation not only preserves life itself but also brain function.
Associated facts in this case such as the development of progressive pulmonary edema, which is frequently associated with drastically increased intracranial pressure, further substantiate the presence of severe closed head injury. The sudden spell which occurred on 4/22/07 at 1053 hours was clearly the outward manifestation of a final shift of the brain due to this increased intracranial pressure and not an epileptiform seizure commonly associated with milder head injury. The clinical pattern of the brain edema as well as the pulmonary edema clearly represent traumatic brain injury and neurogenic pulmonary edema and not progressive fat embolization syndrome. Had the probability of severe *121 intracranial injury been recognized, the fate of this young woman may have been quite different. (Emphasis added).
Ultimately, Dr. Chaput testified at his deposition specifically as to loss chance of survival:
Q. Doctor, given the history provided, ultimately we have a CT that does show the scalp hematoma, the increasing complaints of headache. Had that CT been done either at the time that she was admitted or at any time during that 24-hour period where she’s having these increasing headaches, it certainly would have given Ms. Gannard a better chance of overcoming the injury?
MR. WILLIAMS: Objection to form and foundation.
MR. PALMINTIER: Join.'
A. Yes.
As with the report of Dr. Chaput, the sworn affidavit of Dr. Breech, also filed in evidence in opposition to the motion for summary judgment, contains his report dated June 1, 2009, again before any of the attorneys started asking 18hypothets. After studying all of the medical records, his sworn report stated in pertinent part:
She did die from cerebral edema, but the cause of that cerebral edema was most likely a closed head injury, documented by the fact that when she finally got a CT scan of the head it showed a scalp hematoma and some subarachnoid hemorrhage. You don’t get a scalp hematoma without having. some head trauma and head trauma is the most common cause of cerebral edema. Fat embolism causing cerebral edema has been reported but is an extremely rare finding. The only way to prove there is fat embolism in the brain that caused cerebral edema is with an autopsy finding showing fat globules in the arteries of the brain. This young lady did not have an autopsy. My opinion is that she had some substandard medical care from the beginning, even probably starting with EMS as they gave inaccurate medical information, but once she arrived at the hospital she was not treated with the usual standard of care at all as regards to her overall injuries. Her orthopedic injuries were excellently well treated, but her admitting physician and the ER physicians should have immediately scanned her from head to toe. This is a fairly common practice around the country in these types of situation. There is absolutely no way anyone can state with any degree of certainty that she had fat embolism in the brain. She definitely had cerebral edema, that-is a given fact, and that is the ultimate cause of her demise. (Emphasis added).
The scalp hematoma was clear, objective evidence of head trauma. It was finally noted on the CT scan, as well as being visible on Ms. Gannard’s scalp as she was finally prepared for a cranial pressure monitor. It is significant to note that the hospital had two cranial pressure monitors, neither of which was operable. The patient had to suffér for three—four additional hours before a proper monitoring device could be obtained from a nearby hospital. When a reading was finally taken, it showed severe cranial pressure that was literally “off the charts.” Ms. Gannard’s obvious hematoma could and should have been recognized either in the ER or ICU early on. "
The majority points out that neither doctor testified in .their depositions that the nursing staff violated the standard of care when asked difficult hypothetical ^questions from the hospital’s attorneys. However, Drs. Chaput and Breech were *122 clear -in their written affidavits filed as part of the summary judgment evidence.
In my view, it is inappropriate for our court to assign credibility and weigh the evidence in deciding a motion for summary judgment. For purposes of summary judgment, the hospital admitted as an uncontested material fact that “As a result of the accident, Ms. Gannard was thrown a distance of approximately 75-100 feet, which caused severe orthopedic injuries. Ms. Gannard was not wearing a helmet at the time of the accident.” By ignoring or disregarding this admitted fact, plus the deposition testimony of Dr. Colomb that his review of the records showed complaints of headaches “severe in intensity and constant in duration” that were not reported to him by the nurses, the majority has erroneously, in my view, assessed credibility and weighed the evidence. Likewise, by accepting the deposition testimony of Drs. Chaput and Breech based on incomplete hypothets, and not taking into account their properly admitted summary judgment evidence in the form of their affidavits, the majority, in effect, has again weighed the evidence, assigned credibility and made a factual determination.
At a trial on the merits, the jury will determine credibility and weigh the evidence. The jury will hear testimony from the first responders,- the eye witnesses at the scene of the collision, the ER personnel, the doctors involved in Ms. Gannard’s care, and most, if not all, of the intensive care nurses. Likewise, family members are expected to testify about what they recall about Ms. Gannard’s headaches and complaints while she was in intensive care.
All of the medical records will be introduced. Medical experts will then testify, along with co-defendant, Dr. Colomb. The lawyers will ask their hypothets based on their interpretation of the facts, as they did in deposition. But in the end, |10in a case such as this, it will be up to the jury to assess credibility and weigh the evidence, decide the facts, and assign liability, if any, to the doctor and hospital. That’s what jury trials are for. Indeed Louisiana Constitution Art.l § 22 states, “All courts shall be open, and every person shall have an adequate remedy by due process of law and justice, administered without denial, partiality, or unreasonable delay, for injury to him in his person, property, reputation, or other rights.”
Though in some cases, where the facts are clear and undisputed, summary judgments may be proper. Here, the facts are in dispute. It doesn’t take a medical or nursing expert to conclude that if Mrs. Gannard was thrown from a motorcycle 75-100 feet in the air and landed on pavement without a helmet, she likely would have sustained a concussion, as noted by both Doctors Chaput and Breech in their affidavits quoted infra and ultimately confirmed by the CT scan of the head that was ordered late—too late to give Ms. Gannard a chance at survival.
While it is certainly true that the legislature can enact and our courts can delineate how procedural rules can limit access to our courts in certain circumstances, such as Motions for Summary Judgment, those “procedural hurdles” should not be so high as to deprive a litigant of his constitutionally protected right to a trial by jury, whose very purpose is to resolve credibility and assign proper weight to evidence and testimony in conflict.
In my opinion, this case deserves to be heard by a jury, who will hear all the evidence, not dismissed before trial based primarily on hypothetical questions to well-meaning doctors by well-prepared attorneys.

. The accident happened on April 21, 2007. The headaches were noted the very next morning following surgery.